G3G5donA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   DEBORAH DONOGHUE and AARON
    RUBENSTEIN,
4
                    Plaintiffs,
5
               v.                           14 Civ. 7640 (ER)
6
    MARTIN SHKRELI, *et al.*,
7
                    Defendants.
8
    ------------------------------x
9
                                         March 16, 2016
10                                       10:15 a.m.
    Before:
11
                        HON. EDGARDO RAMOS,
12
                                         District Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

G3G5donA

1                                   APPEARANCES

2   LAW OFFICE OF DAVID LOPEZ
         Attorneys  for Plaintiffs
3   BY:  DAVID LOPEZ
              -and-
4   MIRIAM TAUBER LAW
    BY:  MIRIAM TAUBER
5
    FOX, ROTHSCHILD, O'BRIEN & FRANKEL
6        Attorneys  for Defendant Shkreli
    BY:  SCOTT L. VERNICK
7        WILLIAM H. STASSEN
              -and-
8   REITLER, KAILAS & ROSENBLATT, L.L.C.
    BY:  JOCELYN L. JACOBSON
9
    COOLEY, LLP
10       Attorneys  for Defendant Retrophin, Inc.
    BY:  CELIA G. BARENHOLTZ
11       IAN R. SHAPIRO
         NICHOLAS FLATH
12
    HOGAN LOVELLS, US, LLP
13       Attorneys  for KaloBios Pharmaceuticals
    BY:  PIETER H.B. VAN TOL, III
14
    RIKER, DANZIG, SCHERER, HYLAND, PERETTI, LLP
15       Attorneys  for Vontobel
    BY:  THOMAS M. KENNY
16

17

18

19

20

21

22

23

24

25

G3G5donA

```
 1            (Case called)
 2            MS. BARENHOLTZ:  Celia Barenholtz from Cooley, with
 3    Nicholas Flath and Ian Shapiro for Retrophin.
 4            MR. LOPEZ:  David Lopez and Miriam Tauber for the
 5    plaintiffs.
 6            MR. VERNICK:  Good morning, your Honor.  Scott Vernick
 7    and William Stassen with Fox Rothschild on behalf of
 8    Mr. Shkreli.
 9            MS. JACOBSON:  Jocelyn Jacobson from Reitler Kailas on
10    behalf of Reitler Kailas.
11            MR. VAN TOL:  Good morning, your Honor.  Pieter
12    Van Tol from Hogan Lovells representing KaloBios.
13            THE COURT:  And good morning to you all.
14            I understand there is also a gentleman from Vontobel?
15            MR. KENNY:  Yes, your Honor; Thomas Kenny for
16    Vontobel.
17            THE COURT:  What is that?
18            MR. KENNY:  We are an asset management company.  We
19    are one of the parties subpoenaed by the judgment creditors.
20            THE COURT:  Okay.  Thank you.
21            Well, I have gotten a number of letters concerning the
22    efforts of plaintiffs to collect on the settlement that was
23    approved by this Court, I believe, in December.  So, Mr. Lopez,
24    let me begin with you.  I think you are why we are here so why
25    don't you tell me what you have been doing.
```

G3G5donA

1          MR. LOPEZ:  We have been identifying and restraining

2     assets and we believe we have enough assets now to satisfy the

3     judgment and we will be requesting permission to bring a

4     turnover proceeding to have those assets liquidated.

5          THE COURT:  Okay.

6          What is the position of Retrophin?  As I understand it

7     there is a provision under its bylaws that would seem to

8     require Retrophin to indemnify Mr. Shkreli.

9          MS. BARENHOLTZ:  No, your Honor.  Not exactly.

10          So, in this case we are the judgment debtor to the

11     tune of over $2 million and we have been working with the

12     plaintiffs to try and collect on that judgment.  Separately

13     under Delaware law we do have an obligation to advance funds

14     for legal representation to Mr. Shkreli in connection with

15     various cases that have been brought against him.  To the

16     extent that those cases were brought against him by reason of

17     his service as an officer or director of Retrophin that's a

18     separate matter.  It is a matter governed entirely by Delaware

19     law.

20          The company has already, in a securities litigation,

21     advanced very substantial sums to Mr. Shkreli for his defense

22     and he is in the process of trying to reach an agreement with

23     Mr. Shkreli's new counsel on the advancement request that we

24     started to receive this past February.

25          There are a lot of issues and, again, if we can't

G3G5donA

1   reach agreement it is going to be decided by a Delaware Court,

2   but that obligation is completely separate from the obligation

3   that Mr. Shkreli has to us which is to pay a judgment.  And

4   what Mr. Shkreli has argued in correspondence with the Court is

5   that this still inchoate advancement obligation should be used

6   to offset the judgment and we say that's wrong for two reasons:

7       First, under New York Law a judgment can't be offset

8   by an unadjudicated liability; and two, advancement is like a

9   loan.  It is an extension of credit.  If it is found that

10  Mr. Shkreli didn't act in good faith he has to pay all of those

11  monies back to Retrophin.

12      THE COURT:  So what does that mean in the context of

13  this case where there has been a settlement?

14      MS. BARENHOLTZ:  Well, here we have got a judgment.

15  He has a fixed, absolute obligation to pay that judgment to

16  Retrophin.  We think he has sufficient assets to pay but he

17  hasn't paid and therefore we will join with, we do join with

18  plaintiff's counsel in seeking permission to make a turnover

19  application and enforce the judgment.

20      THE COURT:  Has he paid you anything?

21      MS. BARENHOLTZ:  He has paid us nothing.  He has paid

22  a sum of like $230-some-odd-thousand --

23      MR. LOPEZ:  228.

24      MS. BARENHOLTZ:  -- to plaintiff's counsel.  Retrophin

25  is owed $2.6 million.

G3G5donA

1          MR. LOPEZ:  $2,025,000.

2          MS. BARENHOLTZ:  And it has received nothing.

3          If Mr. Shkreli has -- we believe he does -- the assets

4   to pay, we think he should pay that judgment now, it shouldn't

5   be deferred until some day in the future, because if it is

6   determined that Mr. Shkreli didn't act in good faith, then the

7   company is going to be in the position years from now of having

8   to collect on this judgment and having to collect back all of

9   the money that it paid in advancement of these legal fees and

10  it is going to be years later when he may have dissipated more

11  assets and when there may be more creditors.

12         THE COURT:  That may be, but aren't you -- and again I

13  haven't looked at this issue in some years -- aren't you, under

14  Delaware law, required to advance these fees?  I know that you

15  refer to them as inchoate but until there has been a

16  determination that he acted in bad faith or that there is some

17  liability there, doesn't Delaware law require you to advance

18  those payments?

19         MS. BARENHOLTZ:  Delaware law requires us to advance

20  certain payments and as I said, your Honor, we have already

21  advanced hundreds -- it is hundreds of thousands of dollars in

22  a separate case.  The recent request for advancement will be

23  honored to the extent they're appropriate under Delaware law

24  but there are some real issues.  We haven't gotten detailed

25  invoices so we don't know whether the sums yet are appropriate

G3G5donA

in terms of reasonableness.

There are issues of allocation, your Honor.  For example, in the criminal case that is pending against Mr. Shkreli, there are seven counts in that criminal indictment, only one is called a scheme involving Retrophin, and so there is an issue of allocation.  What Mr. Shkreli is saying is you have to pay all the fees associated with the criminal case and we are saying, no, we have to pay the portion of the fees that relate to his service as an officer of Retrophin.  To the extent he committed or is accused of committing wrongdoing, that has nothing to do with his service as a Retrophin officer, that has to do with entities that he founded before he founded Retrophin.

THE COURT:  That's an interesting issue.  Is there case law on that?

MS. BARENHOLTZ:  Yes, there is, your Honor.

THE COURT:  Okay.

MS. BARENHOLTZ:  Again, that's all Delaware.

I think there is a reasonable chance that we will resolve these issues by agreement.  We only received the required undertakings from Mr. Shkreli's counsel yesterday.

So, I think that we are talking about it, the insurers involved because a lot of these obligations are actually covered by Retrophin's insurance so there is an issue about how much has to be advanced and what exactly is covered by the

G3G5donA

```
1    advancement obligation.  The company has repeatedly said that
2    to the extent it is required by Delaware law to advance it
3    will, but that that obligation is separate and apart from
4    Mr. Shkreli's obligation to us which is to pay a judgment that
5    he agreed to pay and that judgment shouldn't be offset by this
6    right to advancement because the advancement, again, is
7    provisional.  He only gets to keep these monies if it turns out
8    that he acted in good faith which can't be determined until
9    after the criminal case is over.  And because under New York
10   Law which governs your Honor here in terms of the enforcement
11   proceedings, New York Law is very clear that where there is a
12   judgment it can't be offset by an unadjudicated liability.
13              THE COURT:  Even if the parties consent?
14              MS. BARENHOLTZ:  Well, we don't consent but I suppose
15   that if the parties consented we wouldn't be in Court before
16   your Honor.  And the advancement obligation is not one that
17   applies in this case.
18              THE COURT:  I will hear from the other parties but let
19   me ask this question.  Why isn't this something, before we
20   hurdle headlong into very expensive motion practice, why isn't
21   this a matter that can be adjudicated by a magistrate judge
22   rather than, you know, go in and come to an agreement as to
23   what subpoenas are appropriate and what the scope of the
24   subpoenas can be.  I mean, is this something that a magistrate
25   judge can sit down and work out with all of you folks?
```

1          MS. BARENHOLTZ:  Well, I think probably not because we

2     are all -- we are here after attempts to talk to each other and

3     work things out.

4          THE COURT:  Yes, but that is lawyering.  You all

5     behave badly when there is an adult in the room.

6          MS. BARENHOLTZ:  Our concern, your Honor, is that the

7     liability that this judgment represents goes back to 2014.  The

8     agreement in principal on the settlement was reached in July.

9     Your Honor approved the settlement and issued -- signed the

10    judgment in December.  The payment date was January.  Here we

11    are in March, we haven't been paid anything.  As time goes by

12    Mr. Shkreli has been spending significant sums of money on

13    other things so he is dissipating his assets in that time

14    period, he has done things like spend $2 million to buy a

15    one-of-a-kind record album which would be fine if he didn't

16    have a $2 million-plus obligation to my client.

17          So, he has been dissipating assets and as time goes by

18    there may be other creditors out there.  So, we are being

19    prejudiced as time goes by and we are not able to collect on

20    this judgment so we would like to see -- we have done a lot of

21    work to identify assets and what we would like to do is, with

22    your Honor's permission, of course, is to file the motions that

23    we need to file to commence turnover proceedings and if there

24    is a dispute about whether we are entitled to do that, then let

25    Mr. Shkreli do that in the context of a turnover application

G3G5donA

|  |  |
|---|---|
| 1 | but at least the process moves forward.  Meanwhile, this wholly |
| 2 | separate advancement issue will either be resolved by the |
| 3 | parties or a Delaware Court will decide it but that's also a |
| 4 | process that's going to take some time and has nothing to do |
| 5 | with your Honor so there is no reason for your Honor to get |
| 6 | involved in that Delaware law procedure. |
| 7 | THE COURT:  Why is it that you believe that a referral |
| 8 | to a magistrate judge would not be fruitful in this case? |
| 9 | MS. BARENHOLTZ:  Because I think that the time has |
| 10 | come to allow us to go the next step which is to try and turn |
| 11 | over these assets and to sell them.  I think that as time goes |
| 12 | by there is a danger that those assets will decrease in value |
| 13 | which would be prejudicial to us, and I believe that |
| 14 | Mr. Shkreli is doing everything he can to avoid paying an |
| 15 | obligation and that the time has come to say, no, you are a |
| 16 | judgment debtor, you agreed to pay this judgment, the company |
| 17 | made a substantial compromise in agreeing to the settlement. |
| 18 | He is a judgment debtor, he should pay.  And the |
| 19 | proceedings should not be prolonged and the judicial system |
| 20 | shouldn't be burdened by trying to mediate what is really a |
| 21 | very straight-forward matter.  There is a judgment and the |
| 22 | judgment debtor isn't paying it. |
| 23 | THE COURT:  Well, I guess I see the burden on the |
| 24 | judiciary somewhat differently.  I think it would probably be |
| 25 | much efficient to have the parties sit down, work something |

G3G5donA

 1    out, rather than engage in motion practice.  But, Mr. Lopez?

 2              MR. LOPEZ:  Yes.  My viewpoint is slightly different

 3    from Celia's.

 4              My colleague and I have done the bulk of

 5    identification and restraint of assets and we have 30 or 40

 6    subpoenas outstanding.  I think a reference to a magistrate

 7    judge would be of great help to us in sorting out this

 8    nitty-gritty.  So, I demur.

 9              THE COURT:  And I saw you standing up.

10              MR. VERNICK:  Yes, your Honor.  Scott Vernick for

11    Mr. Shkreli, if I may.

12              THE COURT:  Okay.

13              MR. VERNICK:  Your Honor, I have an exhibit I would

14    like to hand up to the Court, with its permission, that I think

15    will advance this discussion a bit.

16              THE COURT:  Certainly.  Do the other parties have

17    this?

18              MR. VERNICK:  I am just handing it out, your Honor.

19              THE COURT:  Okay.

20              MR. VERNICK:  Your Honor, if I may proceed?

21              THE COURT:  Certainly.

22              MR. VERNICK:  Let me say first, your Honor, that I

23    think the Court's suggestion referring this to a magistrate

24    judge for assistance in helping the parties work it out, I

25    think, is a constructive suggestion and we certainly would be

G3G5donA

1    supportive of it.

2              Ms. Barenholtz said that she doesn't have or Retrophin

3    doesn't have detailed invoices on the issue of advancement.

4    That's not correct.  They have detailed invoices with respect

5    to all the cases that are subject to advancement.  This is not

6    a question about Retrophin's insurance carrier.  As your Honor,

7    yourself, has correctly pointed out, under Delaware law they do

8    need to advance Mr. Shkreli his expenses to defend himself from

9    both criminal and civil proceedings.  That is a legal

10   obligation in the first instance that belongs to the company.

11   Now, if the company happens to go underwrite that risk with

12   insurance, that's fine, but you can't say we have to work it

13   out with the insurance companies in the first instance under

14   Delaware law and there is no dispute about that, this is an

15   obligation of Retrophin.  The insurance issue is just a

16   secondary issue, your Honor.

17             There is no prejudice here if we go to a magistrate

18   judge because plaintiff's counsel has restrained Mr. Shkreli's

19   assets in the interim and, presumably, those restraints will

20   stay in place.

21             What we are here before your Honor to articulate is

22   what we last -- we have asked for leave to file a motion under

23   CPLR 5240 and I am sure the Court is aware that permits you

24   broad discretion to prevent abuse and harsh results where there

25   is misuse of enforcement proceedings under state law.  Now

1    here, your Honor, it seems to us that relief is warranted under

2    5240 for a couple of reasons, at least three.

3              One, your Honor, Retrophin owes Mr. Shkreli more money

4    than Mr. Shkreli owes Retrophin under its advancement

5    obligations.  I have put in front of you a one-page sheet which

6    outlines the fees and expenses which are subject to

7    advancement.  Now, I am sure that Retrophin, your Honor, will

8    get up and say we don't owe him almost $8 million.  But, under

9    any reasonable allocation, your Honor, let's say hypothetically

10   that they don't owe him $8 million but they owe him $4 million,

11   even if that's the number, $4 million is greater than the

12   $2,025,000 that Mr. Shkreli owes Retrophin with respect to the

13   judgment putting aside the attorney's fees for Ms. Tauber and

14   Mr. Lopez.

15             Your Honor, this is not an inchoate obligation.  This

16   is a legal obligation under Delaware law that Retrophin itself

17   concedes that it has to advance to Mr. Shkreli under some

18   reasonable number and so we think that for that reason, because

19   the company owes him more than he owes the company, that relief

20   under 5240 is appropriate in this instance.

21             In addition to which, your Honor, the restraints here

22   have gone so far that Mr. Shkreli is unable to pay his lawyers.

23   He is unable to pay Mr. Brafman who represents him in the

24   criminal proceedings pending in the Eastern District of New

25   York and also in the companion case filed by the SEC which is

G3G5donA

1    pending in the Eastern District of New York.

2              THE COURT:  By the way, this, referring to the chart

3    that you handed up, I can't speak to the amounts that the firms

4    seem to be billing.  There is one for a very neat $3 million

5    and I can't imagine that the details for that are what counsel

6    would seem to be, would think to be appropriate.

7              MR. VERNICK:  Mr. Brafman, your Honor -- the $3

8    million is Mr. Brafman's fee for the pretrial phase in the

9    criminal and SEC proceedings.  Mr. Brafman does not bill like

10   other firms does, he bills with a flat fee and, as

11   Ms. Barenholtz pointed out, that is certainly the subject of

12   some discussion and we are certainly prepared to discuss that.

13             THE COURT:  Okay.

14             MR. VERNICK:  One other reason, your Honor, why we

15   think relief is appropriate here, the first reason I have

16   outlined to you is because Retrophin owes more to Mr. Shkreli

17   under its advancement obligations than Mr. Shkreli owes to

18   Retrophin, putting aside the attorney's fee.

19             THE COURT:  Is it Ms. Goldwag or Barenholtz?

20             MS. BARENHOLTZ:  Barenholtz, your Honor.

21             THE COURT:  Ms. Barenholtz says yeah, so what, you

22   can't offset.

23             MR. VERNICK:  I disagree.  There certainly is case

24   law, your Honor, that allows for an offset in the context of

25   enforcement proceedings and the case that I would point to for

G3G5donA

1    that is Mark Paz v. Long Island Railroad which is a Supreme

2    Court Appellate decision July 14, 1977 and which certainly

3    stands for the proposition that where there is an amount owed

4    on the other side it can be set off against the amount that its

5    judgment creditor is trying to collect.

6            Of course the difference here is this is not a

7    liquidated amount, these are dollars that are owed for

8    advancement but, as I have articulated, your Honor, under any

9    view, under any reasonable calculation even allowing for the

10   allocations that Ms. Barenholtz referred to, Retrophin still

11   owes Mr. Shkreli more money than Mr. Shkreli owes Retrophin,

12   even if it is $4 million, even if it is $3 million, whatever

13   the number is.  It seems to us, your Honor, that that is

14   sufficient under 5240 to it allow for relief here in addition

15   to which, as we have said, another basis for relief is that the

16   restraints that plaintiff's counsel has put on Mr. Shkreli's

17   assets prevents him from paying his lawyers including his

18   criminal counsel and there is certainly case law that allows

19   for the Court to modify restraints so that parties can pay for

20   their counsel.

21           THE COURT:  Ms. Barenholtz suggests that apparently

22   those restraints are not working so well because Mr. Shkreli is

23   dissipating his assets.

24           MR. VERNICK:  There is no evidence of that, your

25   Honor, that he is dissipating his assets, not since -- there is

G3G5donA

1     no evidence that I'm aware of that since the restraints have

2     been put in place that he has been dissipating his assets.

3              THE COURT:  The restraints precede or come after the

4     purchase of the Wu-Tang Clan?

5              MR. VERNICK:  They came after, your Honor.

6              THE COURT:  They came after.

7              MR. VERNICK:  Yes.

8              So there is no -- that's why your Honor --

9              THE COURT:  Does he have the assets to pay these --

10             MR. VERNICK:  Well, I think based upon what is in

11    Retrophin's letter to the Court which is identified at a

12    minimum $1.7 million worth of assets we are certainly getting

13    close that number.  He has paid $228,000 in attorney's fees,

14    they have restrained assets of about $1.7 million.  According

15    to the letter that Cooley submitted to this Court, 800,000 in

16    Retrophin stock, depending upon what the market price is, and

17    another 900,000 which is a combination of cash and securities

18    in various bank accounts or brokerage accounts, so that's $1.7

19    million.

20             So, today, assuming that all those assets were turned

21    over, what is really at issue is about $700,000 by the time you

22    add up $228,000 that's been paid and $1.7 million that at a

23    minimum has been restrained, there is now about $700,000 that's

24    owed.

25             Your Honor, we have started discussions about a global

G3G5donA

1   resolution of the dispute.  Mr. Shapiro, who is present today

2   on behalf of Retrophin, we have started discussions about a

3   global resolution with respect to the disputes between

4   Mr. Shkreli and Retrophin.  Mr. Shapiro and I have made some

5   progress in those discussions.

6           It seems to me, your Honor, in line with your own

7   suggestion, that what makes most sense and so as to reduce the

8   burden on the parties and the Court is to call a cease-fire for

9   30 days, status quo, no further activity with respect to the

10  multitude of restraints -- I'm not saying lift them -- I'm

11  saying no further activity, no further activity with the

12  respect of the multitude of information subpoenas which go well

13  beyond what is permissible here in terms of the information

14  that they seek.  In fact, you saw an example yesterday where

15  they wanted his employment records from 10 years ago and now

16  plaintiff's counsel has withdrawn that request.

17          A cease-fire, stand down for 30 days, meet with the

18  magistrate judge, see if we can work this out both as to the

19  amounts owed along with continuing discussion between

20  Mr. Shapiro and I on the advancement issues.  I think that

21  would be a good use of everybody's time.

22          Thank you, your Honor.

23          THE COURT:  Mr. Lopez, that makes a lot of sense to

24  me.  Why shouldn't I do that?

25          MR. LOPEZ:  I would like to make a distinction between

G3G5donA

1    our position, that is to say Ms. Tauber and my position and

2    Retrophin.

3              The judgment, if you recall, is unusual in that at the

4    request of the defense two judgments were made within a single

5    document.  One was to Retrophin for $2,025,000, the other was

6    to Ms. Tauber and me for $600,000.  I don't believe there is

7    any objection on the part of Mr. Shkreli to paying our part of

8    that judgment and we are just getting sucked into this Delaware

9    law offset business that has nothing to do with our part of the

10   judgment.  One way or another I would like to get to a turnover

11   which produces enough cash to settle our position and then we

12   leave it to Cooley and Fox Rothschild to have the discussions

13   that compromise or don't compromise.

14             THE COURT:  Okay.

15             MS. BARENHOLTZ:  Your Honor, if I may?

16             THE COURT:  Yes.

17             MS. BARENHOLTZ:  Our concern is that if we go to a

18   magistrate, if we have a 30-day cease-fire --

19             THE COURT:  Cease-fire.

20             MS. BARENHOLTZ:   -- and we don't resolve this, then

21   we have lost another 30 days.  So, here is my suggestion.  Let

22   us make our motions, let us brief those motions so that they're

23   ready to be heard by your Honor if the magistrate is unable to

24   resolve this matter.  That way we are not prejudiced if the

25   magistrate can't resolve these matters because we won't have

G3G5donA

| | |
|---|---|
| 1 | lost yet another 30 days of time.  We are happy to meet with |
| 2 | the magistrate.  If the magistrate can sort all of this out, |
| 3 | that would be terrific.  But, if the magistrate can't and we |
| 4 | are dealing with somebody who has a history of not paying his |
| 5 | obligations, to be blunt about it, so if a magistrate can't get |
| 6 | this resolved, then we will have our motions teed up and ready |
| 7 | to be heard by your Honor. |
| 8 | THE COURT:  Okay. |
| 9 | Mr. Vernick? |
| 10 | MR. VERNICK:  Your Honor, I see no reason to continue |
| 11 | to vilify Mr. Shkreli.  I object to that. |
| 12 | I think the point is, your Honor, is that it is just a |
| 13 | question of how we spend our time.  I will be guided by you |
| 14 | regarding whether you think the briefing in the interim is |
| 15 | appropriate.  I took from your Honor that there the more |
| 16 | productive path would be to meet with the magistrate and try to |
| 17 | resolve this but if your Honor is of the view that briefing in |
| 18 | the interim is prudent, we will certainly follow your |
| 19 | direction. |
| 20 | Thank you. |
| 21 | THE COURT:  Who else wishes to be heard? |
| 22 | MS. JACOBSON:  Jocelyn Jacobson, Reitler Kailas. |
| 23 | I am fine with the concept of sending this to a |
| 24 | magistrate with a cease-fire on all subpoenas including ones to |
| 25 | third-parties, our banks, etc.  I would just request that any |

G3G5donA

motion practice, I am not sure whether, referring to motion

practice on just the turnover or on the subpoenas but I would

ask, in the interest of the third-parties, not having to

participate in motion practice or respond to additional

continuing subpoenas, that all of that be stayed pending the

magistrate

        THE COURT:  Okay.

        MR. VAN TOL:  Good morning, your Honor.  Peter Van Tol

for KaloBios.

        We are in a slightly different situation as KaloBios,

we are in bankruptcy proceedings in Delaware.  Every time we

have to make an appearance or do anything it is quite expensive

for the estate and takes money away from creditors, so even

participating in proceedings before the magistrate would be

expensive.  I would hope that plaintiffs would withdraw their

subpoena today against KaloBios.  If not, we would like to move

to quash it and I can tell your Honor why.

        The company has nothing that belongs to Mr. Shkreli.

He did not draw a salary while he was at KaloBios, we have none

of his property.

        THE COURT:  As I understand it, you made those

representations in response to the subpoena, correct?

        MR. VAN TOL:  Under oath, your Honor; yes.

        THE COURT:  The only question is now whether you have

to provide someone to be deposed.

G3G5donA

1          MR. VAN TOL:  And that seems to be a waste of time to

2     me, your Honor.  I don't understand it, there is no good faith

3     basis for it, and we would ask today your Honor either order

4     plaintiffs to withdraw the subpoena or that they consent or

5     that we be given permission to move to quash it because

6     KaloBios wants out of this entire matter.

7          THE COURT:  Mr. Lopez, in the spirit of conciliation

8     it seems to me you have what you need and he has nothing for

9     you.

10          MR. LOPEZ:  Mr. Shkreli was, I believe, the chairman

11     of KaloBios.  KaloBios denies any knowledge about him, denies

12     having employment records, social security numbers, etc.  We

13     have suggested a brief deposition by telephone.

14          MR. VAN TOL:  Your Honor?

15          THE COURT:  Yes.

16          MR. VAN TOL:  Mr. Shkreli was the CEO of KaloBios for

17     under a month.  He drew no salary, therefore there was no

18     reason for him to submit any kind of documentation.  It was a

19     confusing, chaotic situation and the paperwork never got done

20     before the indictments were announced.

21          We have provided plaintiff's counsel with a piece of

22     paper saying that Mr. Shkreli's salary was zero.  The only

23     compensation he was going to get from KaloBios was a stock that

24     he purchased on the open market.  We have nothing, your Honor.

25          THE COURT:  Mr. Lopez, if you are not going to

G3G5donA

| | |
|---|---|
| 1 | withdraw the subpoena I'm going to grant the relief that's |
| 2 | requested by KaloBios. |
| 3 | MS. TAUBER:  May I be heard?  This is Miriam Tauber. |
| 4 | THE COURT:  Sure. |
| 5 | MS. TAUBER:  I actually issued the subpoena issued to |
| 6 | KaloBios. |
| 7 | We received Mr. Shkreli's bank records and so we are |
| 8 | aware of a lot of transfers that have gone from Mr. Shkreli's |
| 9 | account into Turing, into Retrophin, into KaloBios, into |
| 10 | Vontobel Bank which is a Swiss bank with management here in New |
| 11 | York. |
| 12 | THE COURT:  Again, slow down. |
| 13 | MS. TAUBER:  Sorry. |
| 14 | We are also aware that many of the current directors |
| 15 | of KaloBios were at one point MSMB people which is |
| 16 | Mr. Shkreli's he old hedge fund.  They were -- some of them |
| 17 | were former directors of Retrophin, some of them were former |
| 18 | directors of Turing, and so I find it -- I would like to |
| 19 | understand more about how money moved between these entities |
| 20 | and where some of that money is being kept, where the |
| 21 | securities are being kept.  All of that is relevant to the |
| 22 | enforcement of the judgment but, again, that's assuming that we |
| 23 | have to move forward into discovery that judgment just won't be |
| 24 | paid voluntarily at some point or that the company and |
| 25 | Mr. Shkreli won't work out a settlement of their offset claims. |

G3G5donA

| | |
|---|---|
| 1 | And, again, I second Mr. Lopez' view that their |
| 2 | dispute has nothing to do with our judgment, our portion of the |
| 3 | judgment, that we would like to be paid now for the work that |
| 4 | we have done in obtaining that judgment.  And I think it is |
| 5 | clear that, one way or another, the company is going to get |
| 6 | value from our work on this case so far whether it is in the |
| 7 | form of offset or in the form of cash. |
| 8 | THE COURT:  As I understand it, Mr. Vernick, you can |
| 9 | confirm this, that Mr. -- well, I have heard three different |
| 10 | pronunciations of his name -- |
| 11 | MR. VERNICK:  Shkreli. |
| 12 | THE COURT:  Shkreli? |
| 13 | MR. VERNICK:  Yes. |
| 14 | THE COURT:  Okay. |
| 15 | MR. VERNICK:  Two syllables, your Honor. |
| 16 | THE COURT:  So he is not contesting that he owes that |
| 17 | amount to the Lopez firm? |
| 18 | MR. VERNICK:  Correct. |
| 19 | THE COURT:  Okay. |
| 20 | MR. VERNICK:  And if I could just clarify one thing, |
| 21 | your Honor, before you fashion whatever relief or order that |
| 22 | you are going to give today? |
| 23 | During this cease-fire, as I phrased it, I wanted to |
| 24 | be clear that if we did want any further activity with respect |
| 25 | to the information subpoenas that were issued on nonparties of |

G3G5donA

| | |
|---|---|
| 1 | which there have been many and a multitude, but also with |
| 2 | respect to the law firms that represent Mr. Shkreli, we would |
| 3 | like the restraints to be lifted that have been -- that have |
| 4 | been served by Ms. Tauber and Mr. Lopez.  So, we are not asking |
| 5 | for the restraints to be lifted anywhere else, just on the law |
| 6 | firms that represent Mr. Shkreli. |
| 7 | THE COURT:  Okay. |
| 8 | MR. VERNICK:  I would be happy to provide those names, |
| 9 | your Honor. |
| 10 | THE COURT:  Okay. |
| 11 | MR. VAN TOL:  Your Honor, if I could briefly address |
| 12 | two points? |
| 13 | One, on bank accounts; there is no bank account in the |
| 14 | name of KaloBios that has any money that is owed to |
| 15 | Mr. Shkreli.  That's one. |
| 16 | Secondly, there is a reference to the shares.  As I |
| 17 | understand it -- and Mr. Vernick may know better -- those |
| 18 | shares in KaloBios are part of an E*Trade account that has been |
| 19 | used to secure the bond in the criminal action.  We have no |
| 20 | access to it at all.  Those are shares purchased on the open |
| 21 | market by Mr. Shkreli. |
| 22 | MR. VERNICK:  That's correct, your Honor. |
| 23 | I think it is a public record but I am happy it say it |
| 24 | in open court that the shares that Mr. Shkreli owns with |
| 25 | respect to KaloBios are held in an E*Trade account and that |

G3G5donA

1    E*Trade account serves as bond or collateral for Mr. Shkreli's

2    bail in the criminal proceedings and we have no access to that.

3            THE COURT:  Okay.

4            MR. VERNICK:  Neither does he.

5            THE COURT:  Okay.  KaloBios has no further obligation

6    to provide a deponent.

7            MR. VAN TOL:  Thank you, your Honor.

8            THE COURT:  Anyone else?

9            MR. KENNY:  Thomas Henny for Vontobel.

10           THE COURT:  This is a beautiful old building but the

11   acoustics are terrible.

12           MR. KENNY:  Briefly, your Honor, because Ms. Tauber

13   mentioned Vontobel.

14           We feel we have fully complied with the subpoenae

15   served on Vontobel Asset Management.  Vontobel Asset Management

16   is a New York entity, it is a subsidiary of Vontobel Holding,

17   A.G. which is a Swiss entity, but Vontobel Asset Management has

18   fully complied, doesn't believe it has any information related

19   to Mr. Shkreli or anything requested in the subpoena.  Whether

20   any other entity that's part of Vontobel Holding, A.G., the

21   Swiss entity has any information related to Mr. Shkreli,

22   frankly we can't say because they're completely separate

23   entities.  We don't have any control or custody over any of

24   their information.  We have no objection to Ms. Tauber seeking

25   any information from those entities, we just can't -- we just

26

G3G5donA

1  aren't in a position to provide any information from those

2  entities.

3  THE COURT:  What is Vontobel and what is its relation

4  to Mr. Shkreli?

5  MR. KENNY:  Vontobel Asset Management, the New York

6  entity, it is an asset management firm but as far as we know we

7  have never held any accounts for Mr. Shkreli.  There are other

8  Vontobel entities located in Switzerland and in different

9  places that are asset management companies, do other banking

10  work.

11  THE COURT:  Okay.

12  Ms. Tauber?

13  MS. TAUBER:  Yes.  I am aware of a Vontobel Swiss bank

14  account in the name of Mr. Shkreli that he sent a million

15  dollars to this year.  I am also aware --

16  THE COURT:  That he sent a million dollars to this

17  year?

18  MS. TAUBER:  Mr. Shkreli did, correct.

19  THE COURT:  Okay.

20  MS. TAUBER:  I am also aware of a Vontobel bank

21  account in the name of Turing Pharmaceuticals which I think is

22  held in Germany that Mr. Shkreli sent $6 million to this year.

23  THE COURT:  I guess the representation has been made

24  that that may be true but it is not him.

25  MR. KENNY:  Yes, it is simply not us and there is

G3G5donA

1   nothing we can do to -- I mean, you can provide us with that

2   information and we can look at the account numbers and that's

3   what we said in our letter responding to the subpoena, but if

4   they are in fact in the possession, custody and control of

5   those entities in Switzerland and Germany, we have no ability

6   to access them and provide any information regarding them.

7            THE COURT:  Can you provide information to the

8   attorney where the subpoenas might be served?

9            MR. KENNY:  Potentially.

10           THE COURT:  Okay.  That means that you do but maybe

11  you won't give the information.  Okay.

12           I just don't know enough about that situation to be

13  able to say one way or the other.

14           Sir?  Did you wish to speak?

15           UNIDENTIFIED SPEAKER:  Me?

16           THE COURT:  No, at the table.

17           MR. STASSEN:  No.

18           THE COURT:  So, where are we?  Mr. Lopez is apparently

19  willing to sit down with Mr. Vernick and work something out, go

20  before a magistrate judge to work something out.

21  Ms. Barenholtz is not.

22           Let me ask you, Mr. Lopez, in terms of the cease-fire,

23  are there any other subpoenas that you are looking to serve or

24  serve within the next 30 days?

25           MR. LOPEZ:  I have to defer to Miriam, she is the

G3G5donA

1   subpoena mill.

2          THE COURT:  Ms. Tauber?

3          MS. TAUBER:  My view is until I -- some of these

4   assets that have been mentioned, Mr. Vernick at one point said

5   $7 million in assets.  Some of those are not of a determinate

6   value.

7          THE COURT:  Slow down.

8          MS. TAUBER:  Some of those are securities and other

9   things that, as people have mentioned, may decline in value

10  pretty rapidly.  As far as I'm concerned, until I have located

11  cash in hand that is approximating $2 million I'm not going to

12  stop.  My intention is to keep serving restraining notices on

13  bank accounts being held by Mr. Shkreli and subpoenas to find

14  the assets.

15         THE COURT:  Why are you worried about $2 million?  Why

16  aren't you worried about the $400,000 you are owed?

17         MS. TAUBER:  I would like to just be worried about

18  that but I guess -- okay, let me take a step back.

19         Right now we have the $230,000 that has been paid to

20  us so far and we have also have been paid or are due to be paid

21  over to the U.S. Marshal, another $370,000 from different bank

22  accounts we have restrained.  So that, right there, is enough

23  to satisfy our portion of the judgment.

24         We have asked, tried to clear whether there is

25  objection in us taking that portion of money.  I don't believe

G3G5donA

1   Mr. Vernick has objected to that.  I don't know if the company

2   objects.  I would like to know if the company objects to us

3   being paid out of that money.  As far as I'm concerned, once we

4   are paid the rest is the company's and Mr. Shkreli's fight to

5   work out.

6          THE COURT:  Right.

7          MS. TAUBER:  But, until I have been told that my job

8   here is done I'm going to keep trying to help the company

9   recover their portion of the judgment because I served these

10  restraining notices that says this judgment has been entered in

11  favor of plaintiffs and Retrophin so any restraints I have

12  placed have been for the benefit of both parties.  So, as far

13  as I'm concerned, I have taken steps that have pretty much

14  enforced our portion of judgment and have gone a long way

15  towards enforcing the company's portion of the judgment.  I am

16  happy to turn over that now to the company at this point and

17  just take our portion and I appreciate what the Court has

18  responded in that way and say why am I not just concerned about

19  my portion but I would like to be just concerned about my

20  portion.

21         So, that's my view.

22         THE COURT:  Okay.  Anyone else?

23         MS. JACOBSON:  Your Honor, just because Ms. Tauber

24  mentioned that she does not intend to have a cease-fire I guess

25  unless this Court orders it, besides the subpoena to this firm,

30

G3G5donA

1    to my firm which was responded to with the exception of

2    attorney-client privilege on one question, she then served my

3    firm with a subpoena duces tecum.  She then served our bank who

4    turned over our bank records to them as far as we understand

5    without telling us, quite.

6           Frankly, so we consider what they've been doing

7    harassment, quite frankly.  We had no money of Mr. Shkreli's at

8    the time of the restraining notice, we informed them of that

9    repeatedly, and despite that they actually served notices on

10   our banks.

11          So, without a cease-fire from them we really want to

12   make a motion to stop them from harassment of our firm which is

13   what we think is going on here.

14          THE COURT:  Okay.  Have you identified sufficient

15   funds and restrained sufficient funds to satisfy the judgment?

16          MR. LOPEZ:  We think we have but some of the assets we

17   have identified are hard to value or impossible to value.

18          For example, Mr. Shkreli appeared on social media

19   holding a record album for which he says he just paid

20   $2 million.  I don't know what we can salvage from that record

21   album at public auction.

22          He has an ownership stake of around 26 percent in the

23   Turing Pharmaceuticals which is a Swiss company that your Honor

24   may have read in the newspaper acquired a $7.50 pill and

25   increased the price by 5,000 percent.  What the Turing stock

G3G5donA

1   might be worth, I don't know.  I think it must be worth

2   something because it still has the, if not patents then the

3   distribution rights, etc., etc., etc., but that is a matter for

4   public auction.

5          THE COURT:  Is Mr. Shkreli still affiliated with that

6   firm?

7          MR. LOPEZ:  Only as an owner, as far as I know.

8          MR. VERNICK:  Only as a stockholder, your Honor.  He

9   is no longer CEO of Turing.

10         THE COURT:  Okay.

11         Mr. Lopez, I have to say, I am a little concerned

12  about the subpoenas on the fringe, for example, to the banks of

13  the law firms.

14         MR. LOPEZ:  $11.5 million passed from Mr. Shkreli to

15  their IOLTA account to we don't know where.  We would like to

16  know where.

17         MS. TAUBER:  To clarify, the subpoena we subpoenaed

18  their account is we knew of an $11.5 million at UBS to Reitler

19  Kailas' IOLTA account.  We asked them about that transfer.

20  They responded they didn't know where it came from and so they

21  sent it back to a different bank.  So, that was a confusing

22  response to me so I subpoenaed the bank -- I subpoenaed their

23  bank records to figure out is it possible they didn't know

24  where it came from?  Why it is they sent it somewhere else.

25         THE COURT:  I'm sorry.  Can you explain to me what

G3G5donA

1      this transaction was?

2                MS. TAUBER:  Mr. Shkreli sent $11.5 million from his

3      account at UBS to Reitler Kailas' IOLTA account and we asked

4      Reitler Kailas about that transfer; where is this money,

5      basically.  And they responded to our subpoena saying, yes, we

6      received that money but we didn't know where it came from.  I

7      quote from their response:  So, we sent it back to a different

8      bank account.

9                So, that was not a satisfying answer to me so I

10     subpoenaed -- I sent them a subpoena duces tecum for their

11     documents reflecting that transfer and they sent it back to me

12     with some redactions on it.  We also -- I didn't -- as I told

13     Ms. Jacobson, I was going to subpoena her bank records for that

14     information as well and I did.  Additionally, we also learned

15     from Turing Pharmaceuticals that Reitler Kailas, at one

16     point --

17               THE COURT:  Sorry.  Who?

18               MS. TAUBER:  Reitler Kailas, Ms. Kailas' firm, at one

19     point held all of Mr. Shkreli's Turing stock.  They don't know

20     where that Turing stock is now.  So, assuming discovery is

21     proceeding on this enforcement issue I would like to know where

22     Reitler Kailas sent that stock because, obviously, that's very

23     relevant information.

24               THE COURT:  Okay.

25               MS. JACOBSON:  Your Honor, if I may?

G3G5donA

1              We told them the money that came into our IOLTA

2       account.  We told them what bank account it left our account

3       and went into of Mr. Shkreli's account.  That was part of our

4       response to the information subpoena.  We gave them the name

5       the bank and the account number of the bank it was sent to.

6       And, as Ms. Tauber knows from speaking with me, the redactions

7       on the documents we gave concerning that was our personal bank

8       account numbers.  It was not information actually relating to

9       the money coming in or out from Mr. Shkreli, it was our

10      personal bank account numbers.  And despite that, they went and

11      subpoenaed both of our banks and I do not know what our

12      operating bank account showed them but I do know that our IOLTA

13      account showed entirely month by month bank records for two

14      months redacting out our account number, redacting out the

15      names of other parties, but showing every dollar amount that

16      went in or out of that account for a two-month period.  I can

17      expect that our operating bank did the same.

18              I think that should be returned to us and destroyed by

19      them, they don't need our personal bank accounts, all right?

20      They sent up a subpoena duces tecum that requires us to send

21      them billing records for Mr. Shkreli.  It is continued

22      harassment.  They know what account of Mr. Shkreli's the money

23      went into.  That is to for them to then track from that bank

24      account, not from us.

25              As to the stock holding, we told them repeatedly we

G3G5donA

```
1    hold nothing of Mr. Shkreli's as of the time of the information

2    subpoena, which we do not.  Had they shown a willingness to

3    cooperate but they made it very clear that they were seeking a

4    motion to compel against us as long as we asserted and

5    attorney-client privilege for communications with Mr. Shkreli.

6    As long as we maintain that privilege they were going to keep

7    coming at us which does not quite frankly bode for cooperation

8    on minor questions that where no matter what I did to try to

9    cooperate they told me it wasn't sufficient.

10            THE COURT:  Let must ask you this.  Are you able to

11   state what services you provided to Mr. Shkreli or that you

12   provided -- did you provide civil litigation or --

13            MS. JACOBSON:  We represented him in several civil

14   litigations and arbitrations.

15            THE COURT:  Okay.

16            MS. JACOBSON:  We were never criminal defense counsel

17   or anything.

18            THE COURT:  And not personal trust and estates type

19   work?

20            MS. JACOBSON:  No.  On a personal level, the work that

21   we did for him was primarily litigation.

22            THE COURT:  Okay.

23            MS. BARENHOLTZ:  Your Honor, if I may?

24            THE COURT:  Sure.

25            MS. BARENHOLTZ:  Very, very briefly.
```

1          I think what your Honor is hearing is that this is a

2    judgment debtor who does have substantial assets one way or the

3    other and is choosing not to pay the judgment.

4          I did say, and in our view best result would obviously

5    be, to not do anything that would stop these proceedings so

6    that we can satisfy that judgment.

7          If your Honor wants to send us to a magistrate I did

8    say we would participate but I really did want to be able to

9    move things along by making the necessary application so that

10   if those proceedings are unsuccessful that we haven't lost

11   still more time.

12         And finally, vis-a-vis plaintiff's counsel who got an

13   award of attorneys fees because they conferred a benefit on the

14   company by bringing this action which led to the judgment, the

15   company hasn't gotten a benefit yet because it hasn't gotten

16   paid a dime on the judgment and, indeed, the company has

17   incurred substantial attorneys fees itself not just with

18   respect to collection but also in the course of the 16B case

19   itself.

20         So, our view is that plaintiff's counsel do have a

21   right under the judgment to their attorneys fees but that they

22   should be paid on a pro rata basis.  So, they shouldn't be paid

23   out entirely while the company has received nothing but we have

24   no objection to a pro rata allocation.

25         THE COURT:  What is the market capitalization of

G3G5donA

```
 1   Retrophin, if you know?

 2             MS. BARENHOLTZ:  My partner says several hundred

 3   million but it is not a number we have offhand.

 4             THE COURT:  This is what I am inclined to do.  I will

 5   just note to Mr. Lopez and Ms. Tauber, I am concerned about

 6   some of the subpoenas that are going out to the banks, of the

 7   law firms if that is in fact what is happening.  There are, I

 8   think, substantial issues there not only perhaps relating to

 9   relevance but issues of attorney-client privilege, etc.

10             What I am inclined to do is to allow the parties to

11   make their motions and to have a briefing schedule that will

12   permit you to, within the next 30 days, have a session with the

13   assigned magistrate judge, and that way I think we address

14   everyone's concerns.

15             I think everyone here wants to make a motion, correct,

16   except for the gentleman for KaloBios?  Or do you want to make?

17   You no longer are, KaloBios?

18             MR. VAN TOL:  No longer that your Honor has granted

19   the relief.

20             THE COURT:  Mr. Lopez, Ms. Tauber, what about you?

21             MR. LOPEZ:  We would like to apply for a turnover.

22             THE COURT:  Okay.

23             Ms. Barenholtz?

24             MS. BARENHOLTZ:  The motion we would like to make is

25   also for turnover, your Honor, and also to obtain discovery
```

G3G5donA

1    from Mr. Shkreli and from his accountant.  Mr. Shkreli has

2    apparently directed him not to respond to our subpoena.

3             THE COURT:  I'm sorry.  What was the last part?

4             MS. BARENHOLTZ:  We also would like to get discovery

5    from Mr. Shkreli himself so we -- plaintiffs have sought his

6    deposition.  We have asked for leave to serve an information

7    subpoena.  We subpoenaed Mr. Shkreli's accountant who has his

8    tax returns and he hasn't produced them because Mr. Shkreli's

9    counsel told him not to.

10            THE COURT:  Okay.

11            MS. BARENHOLTZ:  So, we would like to move to compel.

12            THE COURT:  Very well.

13            I take it, Mr. Vernick, that there are Fifth Amendment

14   considerations.

15            MR. VERNICK:  In addition to -- there are, your Honor,

16   as you correctly point out, but in addition to which, as I

17   think almost everybody knows, the tax returns have no

18   information on them with respect to assets, nor are they likely

19   to lead to information about assets.  That's not what a tax

20   return shows.  It was on that basis, having just learned about

21   the subpoena the other day, that I suggested that turning them

22   over would be irrelevant in the context of enforcement

23   proceedings.

24            THE COURT:  Okay.  But you wish to move also?

25            MR. VERNICK:  Yes.  We will be moving for relief under

G3G5donA

1    5240, your Honor, along the lines that I described including

2    but not limited to the fact that Retrophin is holding more

3    money of Mr. Shkreli's under its obligation advancement than

4    Mr. Shkreli owes the company.

5              THE COURT:  Okay.

6              MR. VERNICK:  And, depending upon what your Honor says

7    about the information subpoenas and the restraints that were

8    served on the law firms that represent Mr. Shkreli, there may

9    be further motion for relief there, your Honor.

10             THE COURT:  Okay.

11             Ms. Jacobson?

12             MS. JACOBSON:  Yes.

13             If Ms. Tauber is not going to withdraw the subpoena we

14   would want to make a motion to quash the currently outstanding

15   subpoena duces tecum that was served on our firm and also seek

16   an order that they cannot seek further discovery from our firm

17   or bank and possibly turn over the information they received

18   from our bank and our bank records.

19             THE COURT:  Mr. Lopez, since you appear to be willing

20   to go through the mediation process with the magistrate judge

21   would you voluntarily agree to lift the restraints and withdraw

22   the information subpoenas for that period of time?

23             MR. LOPEZ:  For Ms. Jacobson's firm?

24             THE COURT:  Yes.

25             MS. TAUBER:  To lift the restraints and withdraw the

G3G5donA

subpoenas?  I think the only question that we have outstanding

for Ms. Jacobson's firm is where the Turing securities were

sent to when they released custody of them.

THE COURT:  Okay.

MS. TAUBER:  Other than that, I think that's all we

need to know at this point.  I am happy to give back the bank

records as well.

MS. BARENHOLTZ:  Your Honor, we don't take a position

on the restraints as to Ms. Jacobson's firm but the predicate

for the cease-fire was that the restraining notices that have

been issued remain in effect so that there would be no

prejudice, and that is obviously of real importance to the

company.

THE COURT:  Okay.  I will leave them in place.  I will

leave them in place and direct you to the magistrate judge.

Who is the assigned magistrate on this case?

MR. LOPEZ:  Magistrate Dolinger.

THE COURT:  Dolinger?  No longer.  He retired.

MR. LOPEZ:  We were not notified.

THE COURT:  We will do a reference and a new

magistrate will be assigned.  So, within 30 days you will be

seen.

In terms of the briefing schedule, I am inclined to

require the opening motions and briefs to be filed in 30 days,

a response 30 days after that, and replies within two weeks.

G3G5donA

1    Does that work for everyone?  And hopefully you won't have the

2    need to file theory papers

3            Mr. Vernick, did you want to saying?

4            MR. VERNICK:  Yes.

5            I just wanted to clarify for the record, I understand

6    that during the next 30 days you are leaving the restraints in

7    place but I want, since there is a number of non-parties who

8    are not present who are waiting to see how today goes and what

9    the outcome is, is it my understanding that during the 30-day

10   period there will be no further action with respect to the

11   information subpoena served on non-parties?

12           MS. TAUBER:  That's fine.

13           THE COURT:  Okay.  Yes.

14           MR. VERNICK:  Thank you.

15           MS. TAUBER:  Just to clarify, though.  If we do find

16   information about bank accounts that were created recently or

17   that we didn't know of previously, are we permitted to serve

18   additional restraints on those bank accounts?

19           THE COURT:  Well, those parties aren't yet represented

20   so they're not here so why don't we, in the interest of getting

21   this stuff worked out, say no.

22           MS. TAUBER:  Okay.

23           THE COURT:  Okay.

24           So, Ms. Rivera, do we have actual dates?

25           THE DEPUTY CLERK:  Yes.

G3G5donA

```
1              The motions are due April 18, 2016; the oppositions

2       are due May 18, 2016; and the replies are due June 1, 2016.

3              THE COURT:  Do we have all of that?  Okay.

4              Anything else?

5              MR. VERNICK:  No, your Honor.  Thank you.

6              THE COURT:  We are adjourned.

7              Thank you, folks, and we will get you to the

8       magistrate as soon as we can.

9                                    oOo

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```